**Opinion issued June 28, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00227-CV

———————————

**JAMES R. CLEVELAND; PAUL R. CLEVELAND; KELLIE L. DORMAN; NICOS ENERGY, LLC; OASIS PETROLEUM, LLC; AND LONE STAR LAND & EXPLORATION, LLC, Appellants**

**V.**

**ROBERT G. TAYLOR II; JOSEPH F. ARCHER; CLAIBORNE BRUCE; ALLAM ALSHAYEB; RUSS HIMEL; RAYMOND CHACHERE; DENNIS MCLAUGHLIN; DALE GORMAN; LOUAY JOUBARANI; SEMAN MATTA; AND CARLO CANGELOSI, Appellees**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 09-CV-175448**

---

## **O P I N I O N**

Appellees, Robert G. Taylor II, Joseph F. Archer, Claiborne Bruce, Allam Alshayeb, Russ Himel, Raymond Chachere, Dennis McLaughlin, Dale Gorman, Louay Joubarani, Seman Matta, and Carlo Congelosi (collectively, "the Investors"), sued appellants, James R. Cleveland, Paul R. Cleveland, Kellie L. Dorman, Nicos Energy, LLC, Oasis Petroleum, LLC, and Lone Star Land & Exploration, LLC (collectively, "the Cleveland parties") for fraud, breach of contract, and other causes of action arising out of investments related to an oil and gas prospect. The trial court eventually entered summary judgment in favor of the Investors on all of their claims. In five issues, the Cleveland parties argue that the trial court erred (1) in denying their motion to compel arbitration; (2) in refusing to allow them to withdraw their deemed admissions; (3) in granting summary judgment in favor of the Investors; (4) in granting summary judgment awarding the Investors attorney's fees of $500,000; and (5) in entering "the death-penalty sanction" against Kellie Dorman.

We modify and affirm as modified.

## Background

The Investors invested various sums of money in an oil and gas venture described by the parties as the Schleicher County well.[1] The investments were primarily solicited by James "Rusty" Cleveland, who controlled the companies Oasis Petroleum, LLC, and Lone Star Land & Exploration, LLC. Paul Cleveland, James's son, was also involved in the venture at issue at various points, both individually and through his operating company, Copperhead Operating, LLC.[2] Many of the investments were received by Nicos Energy, LLC, which was owned by James Cleveland's wife, Kellie Dorman.

The Investors subsequently discovered that James Cleveland had previously pled guilty to securities fraud and had served a prison sentence for that crime. They also discovered that, as a condition of his supervised release, James Cleveland was not supposed to act in a fiduciary capacity at any financial institution. They never received any of the promised returns on their investments regarding the oil and gas venture, and this lawsuit was filed.[3]

---

[1] The record also contains some references to another prospect referred to as the "Fort Bend" or "Pleak" interest. However, the record does not provide a clear description of this interest.

[2] Copperhead Operating, LLC, is not a party to this case.

[3] The parties were also involved in other litigation. According to arguments presented to the trial court, the Investors in this case had previously intervened in a lawsuit that James Cleveland and Lone Star Land & Exploration had filed against the entity with which they had contracted to drill and operate the Schleicher

Two investors, Archer and Taylor, filed their original petition on October 5, 2009, alleging causes of action for common law fraud and fraudulent inducement, breach of contract, conspiracy to defraud, unjust enrichment, and violations of the Texas Theft Liability Act.[4]  Archer and Taylor also demanded an accounting regarding the money they had invested and alleged that "Nicos Energy, LLC, Oasis Petroleum, LLC and Lone Star Land & Exploration, LLC are the alter egos of the individual Defendants."  The remaining investors were subsequently added in amended petitions.[5]  The Cleveland parties filed a general denial on April 9, 2010.

The Investors alleged that James and Paul Cleveland made various representations regarding the Schleicher County well's productivity and potential returns on investments with the purpose of inducing them to invest money.  The Investors wrote checks or wired money to various Cleveland entities, including Oasis Petroleum and Nicos Energy, based on the Cleveland parties' representations that they would assign interests in the prospect to the Investors in return.

County well, claiming that they had an interest in any recovery Cleveland and Lone Star might receive from the driller.  Also, another entity that allegedly invested in the Schleicher County well sued James Cleveland, Paul Cleveland, and Lone Star Land & Exploration, among others, alleging causes of action for negligence, breach of contract, conversion, fraud, and negligent misrepresentation related to the Schleicher County well.  The record does not reveal the outcomes of these suits.

[4]  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (Vernon 2011).

[5]  The Investors also filed various causes of action related to violations of federal and state securities acts, but these claims are not raised on appeal.

4

However, the Investors were never given written documentation of their interests in the well. The Investors alleged that the Cleveland parties' representations about the nature of the oil and gas prospect and the additional wells and production that they intended to procure were all false.

The Investors propounded multiple requests for production and interrogatories, and the Cleveland parties failed to respond. On August 4, 2010, the Investors moved for the first time to compel the Cleveland parties to comply with the Investors' discovery requests. On August 16, 2010, the parties entered an agreed order, signed by the trial court, granting the Investors' motion to compel.

On September 22, 2010, the Investors moved again for sanctions, complaining of multiple instances in which the Cleveland parties "have refused to participate in discovery." The motion for sanctions alleged that the Cleveland parties had not complied with the agreed order of August 16, 2010. The Investors also alleged that "Kellie Dorman refused to attend her properly noticed deposition"[6] and that "James R. Cleveland appeared at his deposition for approximately 17 minutes, where he refused to answer even basic questions regarding his prior employment, and then walked out of the deposition on the advice of counsel when asked about his parole terms for his theft and securities violations conviction."

---

[6] The Investors filed a notice of nonappearance related to Dorman's first failure to appear for her deposition.

On October 4, 2010, attorneys for both sides attended a hearing on the Investors' motion for sanctions. The trial court stated that the Investors' motion for sanctions "appear[ed] to be the death penalty" and that he would attempt to use less-harsh remedies to procure compliance before he struck the Cleveland parties' pleadings and entered a default judgment. The trial court signed an order, dated November 29, 2010, and subsequently amended on December 6, 2010, granting sanctions and compelling discovery. The trial court ordered full and complete compliance with the Investors' previous discovery requests and provided specific dates and times for each Cleveland party to appear to be deposed at the offices of the Investors' counsel, Lytle & Moore, LLP, in Richmond, Texas.

On December 6, 2010, the Cleveland parties filed their first amended answer, special exceptions, and breach of contract counterclaim for unpaid operating costs under a "valid participation agreement." In response, the Investors filed several special exceptions and asserted numerous affirmative defenses.

On December 13, 2010, the Cleveland parties filed their motion to compel arbitration. The motion states, "In a written Participation Agreement[, the Investors] agreed to arbitrate this case in the following terms: A copy of the agreement is attached hereto and is labeled as Exhibit A." It also quotes a portion of the "Participation Agreement" addressing arbitration. However, the

"Participation Agreement" itself is not attached to the motion provided with the clerk's record.

On December 14, 2010, Kellie Dorman again failed to appear for her deposition. The Investors filed a second certificate of nonappearance.

On December 20, 2010, the Investors answered the Cleveland parties' counterclaim and filed special exceptions. The Investors also moved for summary judgment, seeking traditional summary judgment on their own claims and no-evidence summary judgment on the Cleveland parties' counterclaim.

On December 30, 2010, the Investors moved again for orders of contempt and sanctions against the Cleveland parties, arguing that Kellie Dorman and Nicos Energy failed to appear for their depositions and that all Cleveland parties had failed to comply with the court's prior order. The Investors asked that, in addition to ordering further sanctions and holding the Cleveland parties in contempt, the trial court render a default judgment against all Cleveland parties.

On January 10, 2011, the date the Investors noticed for the hearing on their motion for contempt and sanctions, the Cleveland parties moved for a continuance on the grounds that their attorney had a scheduling conflict and that they had moved to compel arbitration and were "awaiting the Order setting this Motion for a hearing." The trial court proceeded with the hearing, granted the Investors' motion, and ordered that Kellie Dorman's pleadings be struck. The Investors also

7

argued their December 20, 2010 motion for summary judgment on all of their claims against the Cleveland parties; the trial court denied the motion.[7]

On January 25, 2011, the Investors filed a motion for default judgment against Kellie Dorman in compliance with the trial court's order striking her pleadings.

On January 27, 2011, the Investors filed a "Notice of Filing [of] Defendant's Admissions," contending that they had served the Cleveland parties with requests for admission on December 21, 2010, and that the Cleveland parties had failed to respond. The Investors attached a copy of their requests for admission to the notice and certified that the notice had been served on Gregg Clements, the attorney for the Cleveland parties.

On January 31, 2011, the Investors filed their response to the Cleveland parties' motion to compel arbitration. The Investors argued multiple bases for denying the motion, including: (1) the Cleveland parties failed to establish that an agreement of the parties to arbitrate existed or that the dispute fell within the scope of an arbitration agreement between the parties; (2) the arbitration clause cited in the motion to compel arbitration was unconscionable because it permitted the Cleveland parties to choose all three members of the arbitration panel; and (3) the Cleveland parties waived their right to compel arbitration "by waiting over a year

---

[7] There is no written ruling on this motion in the record. The trial court stated on the record in a subsequent hearing that it was denied.

8

since this suit was filed, and less than sixty days before the commencement of trial" to bring their motion to compel. Among other arguments, the Investors complained that the Cleveland parties attached only "an unverified and unauthenticated document to their Motion" and that the agreement that was attached was an agreement between Oasis Petroleum, LLC and "an unknown third party, Diane Ganzer." The "Participation Agreement" exhibit attached to the Investors' response, dated November 2, 2007, provided that it "was made and entered into . . . by and between Oasis Petroleum, LLC . . . and Diane C. Genzer. . . ." It was signed by Kellie Dorman on behalf of Oasis Petroleum and by Diane Genzer on her own behalf.

Also on January 31, following a hearing, the trial court rendered default judgment against Kellie Dorman on all of the Investors' claims and on Dorman's counterclaim for unpaid expenses. The trial court further ordered that "the damages of [the Investors'] Second Amended Petition are unliquidated and will be established at an evidentiary hearing to take place on February 4, 2011." The trial court denied the Investors' motion for contempt and sanctions against the remaining Cleveland parties. Finally, the trial court granted the Investors' special exceptions contending that the Cleveland parties' counterclaim was too general to give fair notice of the facts or to plead adequate allegations, among other grounds.

9

The trial court ordered the Cleveland parties to amend the defects in their pleadings by 5:00 p.m. on February 7, 2011.

The Investors again moved, on January 31, 2011, for summary judgment or, alternatively, for sanctions requesting default judgment against the Cleveland parties. The Investors argued, in part, that they were entitled to summary judgment against the Cleveland parties based on their failure to respond to the requests for admissions propounded on December 21, 2010. In addition to the deemed admissions, the Investors also filed numerous other documents demonstrating the Cleveland parties' failure to comply with various discovery requests. The record contains no ruling on this motion.

On February 8, 2011, the Investors filed multiple documents in preparation for the February 15, 2011 trial setting, including their exhibit list, which listed the Cleveland parties' deemed admissions as an exhibit.

On February 9, 2011, the Cleveland parties filed an unsigned, amended counterclaim asserting that the Investors were liable for breach of contract for failure to pay expenses incurred under the contracts at issue. The Investors moved to dismiss the Cleveland parties' counterclaim and sought sanctions against the Cleveland parties for filing a frivolous claim.

On February 15, 2011, the parties appeared in court and were called for trial. The Cleveland parties announced they were not ready for trial, and the trial court

addressed various other pending motions, including a motion for default judgment against Nicos Energy, the Cleveland parties' attempt to file the breach of contract counterclaim, and the Cleveland parties' motion to compel arbitration.

Regarding the motion to compel arbitration, the Cleveland parties' attorney stated at the hearing that he believed all of the Investors had signed identical Participation Agreements and that the originals had been destroyed. The Investors' attorney conceded that some of the Investors signed "a similar agreement" to the "Participation Agreement" provided by the Cleveland parties, but "not all of them did." The Cleveland parties presented no evidence that any Investors had signed agreements, nor did they present any evidence of what the terms of the alleged agreements were. Nevertheless, the Investors also argued that the arbitration provision in the Participation Agreement between Oasis Petroleum and Diane Ganzer was unconscionable on its face because it allowed Copperhead Operating, LLC, a company for which Paul Cleveland was the sole managing member,[8] to name all three arbitrators. The trial court stated, "Well, I just can't believe that an arbitration before three arbitrators that are appointed by one side would be a fair

---

[8] The Cleveland parties' attorney stated at the hearing that the provision involving Copperhead Operating, and Paul Cleveland in the Participation Agreement between Oasis and Ganzer was not relevant to the claims of the Investors. He stated, "And it's our contention that every one of them signed a participation agreement ordering . . . that they shall go to arbitration on a three-arbitrator panel. Then the name on there is not applicable to this case, which you can deduce Copperhead would not be on this. It's the agreement itself without the name that we're saying these [Investors] signed. . . ."

11

arbitration, and, therefore, I'm going to deny [the Cleveland parties'] motion to compel arbitration." The trial court's signed order denying the motion to compel, however, did not provide a basis for the ruling.

The Investors also renewed their previous objections to the Cleveland parties' amended counterclaim for contractual unpaid operating costs, arguing that it did not cure the defects cited in their special exceptions to the Cleveland parties' original counterclaim, that the attached "Participation Agreement" was signed by a non-party to the present suit rather than by one of the Investors, and that the attached agreement did not support a claim for unpaid operation costs, even if it could be enforced against the Investors. The parties also discussed the existence of the Cleveland parties' deemed admissions: the Investors' attorney stated on the record, "We sent requests for admissions that were never responded to."

Finally, the attorney for the Cleveland parties stated that he had "been fired by both of my clients that are here"—James Cleveland and the two corporations he represented, Oasis Petroleum and Lone Star Land & Exploration, and Paul Cleveland—and asked the trial court to allow them time to secure new counsel before proceeding to trial. James Cleveland and Paul Cleveland were both sworn as witnesses and testified that they were in the process of securing new counsel. James also testified that he decided to fire Clements when he realized that Clements had not filed a "motion to compel" or a motion to continue the hearing

12

on the default judgment and that he had started seeking new counsel when he "found out that [Clements] has not been . . . truthful with me about what's going on in this case." He acknowledged, however, that he had not yet entered into a representation agreement or paid fees to another attorney. James also testified that he did not believe he had been adequately represented and that he wanted Clements to file a motion to continue the February 15 trial date so that James could secure new counsel. Paul Cleveland testified that he believed he had a conflict of interest with the other Cleveland parties and that he intended to secure his own counsel separate from that of the remaining parties. He testified that he was not comfortable with Clements representing him at the same time as he represented the other Cleveland parties. Paul further testified that he had retained a new attorney, Charles Watson, that morning.

The trial court stated that it would defer ruling on Clements' motion to withdraw until the Cleveland parties could obtain other counsel, and he admonished Clements, in the presence of James and Paul Cleveland, that if they failed to procure new counsel "within a reasonable time," they would be required to go forward to trial with Clements as their attorney. The trial court granted a continuance on the trial setting to May 17, 2011. However, Clements never filed a written motion to withdraw as counsel and Watson never made an appearance as an attorney of record.

13

On April 4, 2011, the Investors moved a third time for traditional and no-evidence summary judgment against the Cleveland parties. The Investors argued that there was no genuine issue of material fact on their claims for common law fraud and fraudulent inducement, breach of contract, conspiracy, unjust enrichment, Texas Theft Liability Act violations, an accounting, and alter ego, and therefore, they were entitled to summary judgment. The Investors further argued that the Cleveland parties had made "deemed admissions which are the basis for summary judgment." In addition to filing the Cleveland parties' deemed admissions, the Investors filed more than twenty additional exhibits in support of their motion for summary judgment, including multiple affidavits, deposition excerpts, letters produced during discovery, certified copies of proceedings in other courts, and records from the Secretary of State regarding the corporate parties.

On April 12, 2011, the Cleveland parties, through their attorney Clements, moved to abate the trial court proceedings pending their appeal of the trial court's denial of their motion to compel arbitration.[9]

On April 26, 2011, the trial court rendered summary judgment against all the Cleveland parties, including Dorman and Nicos Energy. It ordered that the Cleveland parties, jointly and severally, pay the following amounts to the Investors: Alshayeb, $7,500; Archer, $100,000; Bruce, $30,000; Chachere,

---

[9] The record does not contain an explicit ruling on the motion to abate.

14

$30,275; Cangelosi, $185,000; Gorman, $55,000; Himel, $150,000; Joubarani and Matta, $472,000; McLaughlin, $227,039.98; and Taylor, $199,392, for a total of $1,456,206.98. The trial court also awarded $500,000 as attorney's fees, and it awarded "taxable costs" without specifying a dollar amount.

On May 23, 2011, new counsel filed an appearance on behalf of the Cleveland parties. On May 24, 2011, the Cleveland parties moved to withdraw the deemed admissions, moved for a new trial, and moved to set aside the death-penalty sanction against Dorman. This motion was accompanied by the affidavits of James Cleveland, Paul Cleveland, Kellie Dorman, and Gregg Clements, among other documents. In their affidavits, James Cleveland, Paul Cleveland, and Kellie Dorman all averred that they were not aware of the requests for admissions and would have answered them had they been aware and that they first learned of the requests for admissions after the trial court rendered summary judgment. Clements averred that his office received the requests for admissions but he did not see or answer them. He stated that it "appears to be true" that no one from his office informed the Cleveland parties about the requests for admissions due to some turnover in his office staff. Finally, he stated that he did not intentionally fail to answer the requests for admission, but that his failure was due to "oversight and mistake on my part, as well as the disorganized situation in my office at that time."

15

On July 11, 2011, following a July 7, 2011 hearing, the trial court denied the Cleveland parties' motion to withdraw the deemed admissions, motion for new trial, and motion to set aside Dorman's death-penalty sanction.

## Motion to Compel Arbitration

In their first issue, the Cleveland parties argue that the trial court erred in denying their motion to compel arbitration.

A party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration provision. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). The presumption in favor of arbitration arises only after the party seeking to compel arbitration proves that a valid agreement exists. *Id.*

Here, the Cleveland parties have failed to prove that any of the Investors entered a valid agreement to arbitrate. The Cleveland parties referenced only the Participation Agreement between Oasis Petroleum and Diane Ganzer, an individual who is not a party to this suit. The Cleveland parties presented no evidence that the terms of that Participation Agreement apply in the instant case. They presented only their motion to compel and the argument of their counsel that all of the Investors signed similar agreements and that at least one of the terms of the Participation Agreement—the clause designating the party who would choose the panel of arbitrators—did not apply in the present case. Neither an attorney's

16

arguments nor the pleadings or motions of a party constitute evidence. *See, e.g.*, *Love v. Moreland*, 280 S.W.3d 334, 336 n.3 (Tex. App.—Amarillo 2008, no pet.); *Potter v. GMP, L.L.C.*, 141 S.W.3d 698, 704 (Tex. App.—San Antonio 2004, pet. dism'd); *see also Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995) (stating that pleadings, even if sworn and verified, are not generally competent evidence to prove facts alleged in them); *McCain v. NME Hosps., Inc.*, 856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ) ("Motions and arguments of counsel are not evidence."). Thus, the Cleveland parties failed to meet their burden of proving the existence of a valid agreement to arbitrate between the parties, and the trial court did not abuse its discretion in denying the motion to compel arbitration. *See Webster*, 128 S.W.3d at 227.

The Cleveland parties argue that the trial court based its ruling on the Investors' argument that the arbitration agreement was unconscionable and that the ruling should be overturned on that ground. However, the written and signed order of the trial court denied the motion to compel without providing a basis for the ruling. "[A] judgment or order that is rendered in writing and signed by the trial judge becomes the official judgment of the court," and recitals in a signed order "control over conflicting recitals in either the reporter's or clerk's record." *Lopez v. Brown*, 356 S.W.3d 599, 603 n.4 (Tex. App.—Houston [14th Dist.] 2011, no pet.). We may uphold an order denying arbitration if it is proper on any basis

17

considered by the trial court. *See Bates v. MTH Homes-Texas, L.P.*, 177 S.W.3d 419, 422 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 367 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding).  Because we have concluded that the order denying arbitration was proper on the basis that the Cleveland parties failed to establish the existence of a valid agreement to arbitrate between the parties, we need not address the remaining grounds presented to the trial court.

We overrule the Cleveland parties' first issue.

### Withdrawal of Deemed Admissions

In their second issue, the Cleveland parties argue that the trial court erred in refusing to allow them to withdraw their deemed admissions.

Once an action is filed, a party may serve written requests for admissions that can encompass "any matter within the scope of discovery, including statements of opinion or of fact or of the applications of law to fact. . . ." TEX. R. CIV. P. 198.1; *Marino v. King*, 355 S.W.3d 629, 632 (Tex. 2011) (per curiam).  If the opposing party does not serve its responses to the admissions requests within thirty days, the matters in the requests are deemed admitted against the party without the necessity of a court order.  TEX. R. CIV. P. 198.2(C); *Marino*, 355 S.W.3d at 633.   Any matter admitted or deemed admitted is conclusively established unless the court, on motion, permits withdrawal or amendment of the

18

admission. TEX. R. CIV. P. 198.3; *Boulet v. State*, 189 S.W.3d 833, 836 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989)).

We review a trial court's ruling on a motion to withdraw deemed admissions for an abuse of discretion. *See Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005) (per curiam) ("We recognize that trial courts have broad discretion to permit or deny withdrawal of deemed admissions, but they cannot do so arbitrarily, unreasonably, or without reference to guiding rules or principles."). Withdrawal of deemed admissions is permitted upon a showing of good cause and a finding by the trial court that (1) the party relying upon the deemed admissions will not be unduly prejudiced, and (2) presentation of the merits of the action will be served. TEX. R. CIV. P. 198.3; *Marino*, 355 S.W.3d at 633. The party seeking withdrawal of the deemed admissions has the burden to establish good cause. *Boulet*, 189 S.W.3d at 836.

The Texas Supreme Court has held that, under special circumstances, a party may bring a request to withdraw deemed admissions for the first time in a motion for new trial. *See Wheeler*, 157 S.W.3d at 442; *see also Marino*, 355 S.W.3d at 632–33 (holding that trial court erred in denying pro se appellant opportunity to withdraw deemed admissions, in spite of fact that she never formally made such request before trial court, because her "argument and pending motions" filed prior

to rendition of summary judgment provided evidence of good cause and lack of prejudice). However, the supreme court has also held "the equitable principles allowing these arguments to be raised in a motion for new trial do not apply if a party realizes its mistake before judgment and has other avenues of relief available." *Wheeler*, 157 S.W.3d at 442 (citing *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002)); *see also Unifund CCR Partners v. Weaver*, 262 S.W.3d 796, 798 (Tex. 2008) (holding that summary judgment motion put appellant on notice of deficiency of his response to requests for admissions, and, thus, appellant knew of his mistake before judgment but failed to respond, thereby waiving his right to challenge deemed admissions).

The Cleveland parties argue that they are entitled to "a more lenient standard" because: (1) the trial court's summary judgment "was based on merits-preclusive deemed admissions"; (2) the Investors' "requests for admissions were aimed at seeking admissions that [the Cleveland parties] did not have a case, as opposed to gathering information" and the requests asked the Cleveland parties to "admit the elements of [the Investors'] claims against them"; and (3) "there was no evidence of flagrant bad faith or callous disregard for the rules and the [Investors] could prepare for trial without the admissions." Specifically, they argue that their motion for new trial affidavits and the affidavit of Gregg Clements establish that they acted in good faith, that they were unaware of the requests for admission due

to Clements' poor representation, and that they would have responded had they known of the existence of the requests for admission.

The Investors served the Cleveland parties, through their attorney Gregg Clements, with requests for admissions on December 21, 2010, and the Cleveland parties failed to respond. Prior to the trial court's rendition of judgment, the Investors (1) filed a notice of the Cleveland parties' deemed admissions on January 27, 2011; (2) filed two motions for summary judgment—one on January 31, 2011, and one on April 4, 2011—based, in part, on the Cleveland parties' deemed admissions; (3) filed a trial exhibit list including the deemed admissions as an exhibit; and (4) stated on the record at the time of the original trial setting, February 15, 2011, in the presence of both James and Paul Cleveland and their attorney, the fact that the Investors "sent requests for admissions that were never responded to" by any of the Cleveland parties, in addition to pointing out several other discovery and pleading abuses. The notice of deemed admissions, two motions for summary judgment, trial exhibit list, and discussion on the record in the presence of two of the Cleveland parties and their attorney demonstrate that the Cleveland parties had notice of their mistake before the trial court rendered judgment and that they had other avenues of relief available, but that they failed to take action until after the trial court's judgment. Thus, we conclude that the

21

Cleveland parties waived their right to challenge the deemed admissions. *See Weaver*, 262 S.W.3d at 798; *Wheeler*, 157 S.W.3d at 442.

The Cleveland parties cite *Wheeler* and *Marino* to support their arguments on this issue. In *Wheeler*, although the pro se litigant, Wheeler, filed her responses to the requests for admissions two days after they were due because of a miscalculation involving the mailbox rule, they were filed six months before the motion for summary judgment based exclusively on the deemed admissions was heard. 157 S.W.3d at 441. The supreme court held that Wheeler did not waive her complaint regarding withdrawal of the deemed admissions by presenting it for the first time in her motion for new trial because "nothing in this record suggests that before summary judgment was granted, [Wheeler] realized that her responses were late, that she needed to move to withdraw deemed admissions, or that she needed to file a response to the summary judgment raising either argument." *Id.* at 442.

The court observed that Wheeler's procedural failures were based on her mistaken understanding of when "service" occurred and of what a summary judgment "hearing" was and concluded, "On this record, the lower courts could have concluded that [Wheeler] was wrong on her dates and wrong on how to correct them, but not that either was the result of intent or conscious indifference." *Id.* The court noted, however, that "[b]y contrast, if the same elementary mistakes

had been made by a lawyer, such a conclusion might well be warranted." *Id.* at 442 n.1.

The supreme court reached a similar conclusion in *Marino*, where the pro se litigant's responses to the requests for admission were one day late, where she had filed "argument and pending motions" raising grounds for continuing the summary judgment hearing and denying the motion for summary judgment, and where the record indicated that she had presented good cause to extend the discovery deadline before the trial court ruled on the summary judgment motion based exclusively on the deemed admissions. 355 S.W.3d at 630–33.

This case is distinguishable from both *Wheeler* and *Marino*. Here, the Cleveland parties were represented at all times by an attorney, unlike the pro se litigants in *Wheeler* and *Marino*. Furthermore, the Cleveland parties did not file responses to the requests for admissions until well after the trial court rendered summary judgment, rather than just a day or two after the original admissions deadline, as occurred in *Wheeler* and *Marino*. In fact, the Cleveland parties failed to respond to numerous discovery requests and orders compelling production, even after the February 15, 2011 trial setting, when their failure to respond to admissions and other discovery was discussed on the record in the presence of both James and Paul Cleveland and their attorney. Following this hearing, they failed, for the third time, to respond to the Investors' motion for summary judgment.

23

Finally, the trial court's summary judgment here was not, as the Cleveland parties argue, based exclusively upon the deemed admissions. The Texas Supreme Court has acknowledged that requests for admissions were "never intended to be used as a demand upon a plaintiff or defendant to admit that he had no cause of action or ground of defense." *Stelly v. Papania*, 927 S.W.2d 620, 622 (Tex. 1996) (per curiam). The supreme court has held that "when admissions are deemed as a discovery sanction to preclude a presentation of the merits, they implicate the same due process concerns as other case-ending discovery sanctions." *Marino*, 355 S.W.3d at 632; *Wheeler*, 157 S.W.3d at 443. Thus, in *Wheeler*, the supreme court held that "absent flagrant bad faith or callous disregard for the rules, due process bars merits-preclusive sanctions." *Wheeler*, 157 S.W.3d at 443; *see also Marino*, 355 S.W.3d at 633 (stating that *Wheeler* "required a showing of 'flagrant bad faith or callous disregard for the rules' to substantiate a summary judgment based solely on deemed admissions.").

Here, contrary to the Cleveland parties' arguments, we need not determine whether the record demonstrates the existence of flagrant bad faith and callous disregard for the rules because the summary judgment was not based solely on the deemed admissions. *See Marino*, 355 S.W.3d at 633 (stating that *Wheeler* "required a showing of 'flagrant bad faith or callous disregard for the rules' to substantiate a summary judgment based *solely* on deemed admissions.") (emphasis

added). Instead, we analyze the propriety of the summary judgment and supporting evidence.

We overrule the Cleveland parties' second issue.

**Summary Judgment**

In their third issue, the Cleveland parties argue that the trial court erred in rendering summary judgment against them. The Investors asserted multiple grounds for recovery, including claims for fraud and fraudulent inducement, breach of contract, conspiracy, unjust enrichment, alter ego, and violations of the Texas Theft Liability Act and other statutory violations, against all the Cleveland defendants, including Dorman and Nicos Energy. The trial court rendered summary judgment against all of the Cleveland parties, jointly and severally, for the amounts the Investors had invested with the Cleveland parties.

**A. Standard of Review**

We review de novo the trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). To prevail on a traditional summary judgment motion, the movants must establish that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). Parties moving for summary judgment on their own claims must conclusively prove all essential elements of the

25

claim. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see also* TEX. R. CIV. P. 166a(a) ("A party seeking to recover upon a claim . . . may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof."). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). "[S]ummary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right." *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993).

If the movants meets their burden, the burden then shifts to the nonmovants to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). To determine if the nonmovants have raised a fact issue, we review the evidence in the light most favorable to the nonmovants, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors

26

could not. *Fielding*, 289 S.W.3d at 848 (citing *City of Keller*, 168 S.W.3d at 827). We indulge every reasonable inference and resolve any doubts in the nonmovants' favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

We must affirm the summary judgment if any of the grounds presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Pickett v. Tex. Mut. Ins. Co.*, 239 S.W.3d 826, 840 (Tex. App.—Austin 2007, no pet.).

## B.     The Investors' Breach of Contract Claim

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prods. Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

The Investors argued in their motion for summary judgment that (1) they had valid contracts with the Cleveland entities, (2) that each Investor performed pursuant to the contract by investing the amount agreed upon between the parties, (3) that the Cleveland parties breached the agreement by failing to properly invest the money, and (4) that they were harmed by the Cleveland parties' breach. They supported this argument with the affidavits of the Investors and their supporting

27

exhibits.  The Investors also included deposition excerpts from James and Paul Cleveland regarding their involvement in the oil and gas prospect and the nature of their interest in the corporate entities involved, documents related to other litigation involving various Cleveland parties, letters written by James and Paul Cleveland, documents from the Texas Secretary of State regarding the corporate entities involved, and the Cleveland parties' deemed admissions.

The Investors' affidavits outlined the nature of their agreement and course of dealing with the Cleveland parties.  For example, Robert Taylor averred that, in approximately February or March 2007, James and Paul Cleveland represented that the Schleicher County well was "producing approximately 10 million cubic feet of gas per day."  In April 2007, James told Taylor that "he would transfer a 2% ownership interest in the leases and existing well in exchange for an immediate investment in this Schleicher County well that he claimed . . . was producing in excess of 10 million cubic feet of gas per day."  James told Taylor to wire the money to an account for Nicos Energy, which James represented that he controlled.  Taylor averred that James sought a second investment in May 2007 to convert the well to a saltwater injection well and to drill a new well that would improve production from the lease.  Taylor stated that James promised him that this investment "would represent a 4% or 6% interest in the leases."

Taylor averred that James Cleveland eventually provided an unsigned lease entered into between "Larry J. Kerr" and "Ryanco Trust" that indicated the potential interest in the Schleicher County property expired on April 17, 2007, "which was prior to the dates that [Archer] and I made our investments." He stated that James never provided further documentation regarding Taylor's interest in the lease or the wells. Taylor stated that James eventually gave him "a handful of invoices showing some work-over to the well totaling approximately $300,000 [the amount invested by Taylor and Archer], in an effort to show that work had been done, but this shows that a small amount of re-work to a damaged well was done, not that a new well was drilled or that a saltwater injection well had been drilled or completed." Finally, Taylor averred that "the Schleicher County well had no production" and that there "was never any saltwater injection well. There was never a new well drilled." He stated that "there was no work being performed as of the date that I invested onward."

Attached as exhibits to Taylor's affidavit were certified copies from the Texas Railroad Commission showing that the Schleicher County well, operated by Copperhead Operating, LLC, an entity controlled by Paul Cleveland, had no production between January 2003 and January 2011, email correspondence between Taylor and James Cleveland, a copy of the unsigned lease, and documents reflecting the wire transfers Taylor made to Nicos Energy. Taylor's exhibits also

29

included two copies of "Contract Assignments" that James Cleveland delivered to Taylor in August 2007. The Contract Assignment acknowledged the receipt of "a wire transfer payable to Nicos Energy, LLC, represented by James R. Cleveland, acting in his capacity as President of Nicos Energy, LLC, (hereinafter referred to as Assignor), for the Schleicher County Lone Star Land & Exploration, LLC lease." It further stated: "Oasis Petroleum, LLC agrees to assign, sell, convey, and will transfer to Taylor . . . upon completion of the first well" a working interest in that well and the saltwater injection well located on the lease.

We conclude that Taylor's statements recounted above were clear, positive, direct, otherwise credible and supported by accompanying documents, free from contradictions and inconsistencies, and could have been readily controverted. Thus, these portions of Taylor's affidavit could serve as the basis for granting summary judgment. *See Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997) (holding that uncontroverted, self-serving affidavit of interested witness may serve as basis for granting summary judgment if evidence is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted."); *see also* TEX. R. CIV. P. 166a(c) (discussing use of affidavits as summary judgment evidence).

Archer, McLaughlin, and Cangelosi made substantially similar statements in their affidavits and also provided multiple supporting documents. Himel likewise

30

averred that he invested money in the Schleicher County well in exchange for a certain interest in the well, and that several friends—investors Alshayeb, Bruce, and Gorman—also invested based on similar arrangements. Himel's affidavit included exhibits regarding his own transfers and alleged interests, as well as the business records affidavits of Alshayeb, Bruce, and Gorman reflecting their investments and purported interests in the Schleicher County well in the form of additional "Contract Assignments" and checks or wire transfers paid to Oasis Petroleum or Nicos Energy. All investors averred that the Cleveland parties failed to invest the money as promised and that they never received any payment from any of the Cleveland parties.

The Cleveland parties argue only that the Investors' proof of this claim "relies on the [Investors'] testimony, which does not rise to the level of conclusively establishing breach." However, as we have already discussed, the affidavits of the Investors provided the terms upon which they paid money to the various Cleveland parties, and the Investors averred that the money was not invested consistent with those terms. These statements were "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted," and, thus, served as a proper basis for granting summary judgment. *See Montiel*, 949 S.W.2d at 310. These statements were further supported by documents demonstrating that the Cleveland parties accepted

31

various payments but never produced any gas from the Schleicher County well or drilled the promised saltwater injection well or "new" well.

Regarding damages, the Investors presented multiple affidavits, financial records, and, in addition, deemed admissions regarding the amount of money each investor paid to the Cleveland parties. The Investors averred that the money they invested was not used as promised and that they never received any payment or compensation from the Cleveland parties. The exact amount of each Investors' investment was provided in the individual affidavits or business records and was also the subject of deemed admissions. These amounts constituted reliance damages of the Investors. *See Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007) (stating that reliance damages are one type of recoverable damages for breach of contract and are intended to "compensate for the plaintiff's out-of-pocket expenditures"); *see also Chung v. Lee*, 193 S.W.3d 729, 733 (Tex. App.—Dallas 2006, pet. denied) ("When . . . a party makes a substantial investment in performing the agreement and the agreement is breached, she is entitled to have that investment returned.").

We conclude that the summary judgment evidence, adduced by the Investors and never controverted by the Cleveland parties, established that the Investors agreed to invest cash with various Cleveland parties in exchange for an interest in the Schleicher County well, that the Investors made such investments, that the

32

Cleveland parties breached the agreement by failing to provide the Investors with the agreed upon interests and by failing to use the investments to develop those interests, and that the Investors were damaged by this breach in the amount of their investments. Thus, the Investors established each element of their cause of action for breach of contract against the Cleveland parties. *See Prime Prods. Inc.*, 97 S.W.3d at 636 (providing elements of breach of contract claim); *see also Rhone-Poulenc, Inc.*, 997 S.W.2d at 223 (holding that party moving for summary judgment on his own claim must conclusively prove all essential elements of the claim); *City of Keller*, 168 S.W.3d at 816 (holding that matter is conclusively established if reasonable people could not differ as to conclusion to be drawn from evidence).

Therefore, the burden shifted to the Cleveland parties to raise a genuine issue of material fact. *See Centeq Realty, Inc.*, 899 S.W.2d at 197. The Cleveland parties, who did not respond to the motion to summary judgment in the trial court, failed to present any evidence raising a genuine issue of material fact.

We hold that the trial court did not err in granting summary judgment on this ground.[10] Because the Investors' claim for breach of contract supports the

---

[10] We note that the Investors' motion for summary judgment included arguments and authority that they were entitled to no-evidence summary judgment on the Cleveland parties' counterclaim for unpaid expenses, and the trial court's judgment ordered "that all claims by [the Cleveland parties] against [the Investors]

33

judgment of the trial court, we need not address the other grounds asserted in the motion for summary judgment.[11] *See Provident Life & Accident Ins. Co.*, 128 S.W.3d at 216 (holding that we must affirm summary judgment if any ground presented to trial court is meritorious).

## Attorney's Fees

In their fourth issue, the Cleveland parties argue that the trial court erred in awarding $500,000 in attorney's fees.

The trial court awarded attorney's fees of $500,000 based on the affidavit of the Investors' attorney, Jeremy Stone. Stone provided his qualifications as a shareholder with his law firm and an attorney with general knowledge regarding reasonable and necessary fees customarily charged for legal services in Harris and Fort Bend Counties. He averred that he and his firm provided representation for all of the Investors totaling over 600 hours, and he provided a list of services he performed. Stone stated that his hourly rate was $300 per hour and his associate's rate was $200 per hour, "which are reasonable rates considering the factors" he had previously discussed, such as time and labor required, the fee customarily charged,

---

are dismissed with prejudice. The Cleveland parties do not complain of this portion of the trial court's ruling on appeal.

[11] The trial court's summary judgment was rendered against all Cleveland parties, including Dorman. Because we uphold the trial court's judgment against Dorman on this basis, we need not address the Cleveland parties' fifth issue, arguing that the trial erred in striking Dorman's pleadings and entering a default judgment on liability only against her prior to its entry of summary judgment.

and the nature and length of the professional relationship with the client. He specifically averred that "[t]he total amount of attorneys' fees, including paralegal time, is $142,400, which is reasonable and necessary." He further stated that his firm "incurred $12,675.54 in expenses" and that "these fees were reasonable and customary." Finally, he stated that his firm "has a 40% contingency fee agreement with Plaintiffs. It is my opinion [that] 40% of the judgment amount against Defendants would be a reasonable and necessary fee considering the factors above."

The Cleveland parties did not respond to the motion for summary judgment or object to Stone's affidavit before the trial court entered judgment. They argued for the first time in their motion for new trial that the award of $500,000 in attorney's fees was erroneous because the Investors did not conclusively establish that they were entitled to $500,000 in attorney's fees because Stone averred that both $142,400 and 40% of the judgment constituted a reasonable fee.

We review an award of attorney's fees for abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles. *Id.* at 21. When reviewing a trial court's decision under this standard, we must view the evidence in the light most favorable to the trial court's ruling and indulge every presumption in its favor. *Phillips & Akers, P.C. v. Cornwell*, 927 S.W.2d 276, 279

35

(Tex. App.—Houston [1st Dist.] 1996, no writ). We have already held that the trial court properly rendered summary judgment on the Investors' breach of contract claim, which is a claim that supports an award of attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2008) (permitting recovery of attorney's fees "in addition to the amount of a valid claim and costs" in a breach of contract action). Thus, the only remaining question is whether the trial court's award of $500,000 in attorney's fees was reasonable and necessary.

Whether fees are reasonable and necessary is a question of fact. *Bocquet*, 972 S.W.2d at 21. The non-exclusive factors the factfinder may consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

36

*Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561 n.7 (Tex. 2006); *Arthur Andersen & Co. v. Perry Equip. Co,*, 945 S.W.2d 812, 818 (Tex. 1997).

Although what constitutes reasonable attorney's fees is a question of fact, clear, direct, and uncontroverted evidence, even evidence from an interested witness, will establish that attorney's fees sought are reasonable, necessary, and credible, where the opposing party had means and opportunity to disprove the testimony but failed to do so. *See Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547–48 (Tex. 2009); *Rosenblatt v. Freedom Life Ins. Co.*, 240 S.W.3d 315, 321 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Here, Stone's affidavit averred that, based on the *Arthur Andersen* factors, the time spent by his firm, and the services rendered, $142,400 in fees and $12,675.54 in costs were reasonable and necessary. This evidence was clear, direct, and uncontroverted. The Cleveland parties had the means and opportunity to disprove the evidence but failed to do so. Thus, this evidence established that the specific attorney's fees and expenses sought by the Investors—$155,075.54— were reasonable and necessary. *See Smith*, 296 S.W.3d at 547–48.

However, Stone's statement that 40% of the judgment would be a reasonable and necessary fee in light of his firm's 40% contingency fee agreement with the Investors does not justify increasing the fee award beyond the specific amount requested by the Investors. Attorney's fees cannot be awarded as a percentage of

37

an amount of damages based solely on the existence of a contingency fee contract. *See Arthur Andersen & Co.*, 945 S.W.2d at 818–19. To recover attorney's fees from the defendant, a plaintiff must request a specific sum for the attorney fees, not expressed as a percentage of the damages. *Id.* at 819. While a contingent fee may be "a reasonable fee from the standpoint of the parties to the contract[,]" that alone does not make the fee "reasonable for purposes of shifting that fee to the defendant." *Id.* at 818–19.

Therefore, we sustain the Cleveland parties' fourth issue in part and modify the portion of the trial court's judgment awarding attorney's fees by reducing the amount awarded from $500,000 to $155,075.54.

## Conclusion

We modify the judgment of the trial court to reduce the award of attorney's fees to the Investors to $155,075.54. We affirm the judgment of the trial court as modified.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Sharp.